UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
ABDOOL AZEEZ,

                       Petitioner,

       -against-

SUPERINTENDENT LYNN LILLY,

                       Respondent.
--------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

22 Civ. 6028 (KMK)(JCM)

To the Honorable Kenneth M. Karas, United States District Judge:

    Abdool Azeez ("Petitioner"), proceeding *pro se*, filed a petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 on July 18, 2023 (the "Petition").[1] (Docket No. 15).  The

District Attorney of Westchester County, on behalf of Superintendent Lynn Lilly ("Respondent"

or "State"), opposed the Petition on November 21, 2023. (Docket No. 30).  Petitioner submitted a

reply on January 22, 2024 (the "Reply"). (Docket Nos. 48, 50, 51).

    On April 1, 2024, after reviewing the Reply, I directed the State to file a supplemental

brief addressing, *inter alia*, the effect that Petitioner's state habeas petitions have on the statute

of limitations for this action, if any. (Docket No. 59).  The State filed its supplemental brief on

April 5, 2024, (Docket Nos. 60, 61, 62), and Petitioner filed a supplemental reply on May 7,

2024, (Docket No. 70).  For the reasons set forth below, I respectfully recommend dismissing the

Petition as untimely.

---

[1] A pro se prisoner's papers are deemed filed at the time he or she delivers them to prison authorities for forwarding to the court clerk. *See Houston v. Lack*, 487 U.S. 266, 270 (1988); *Walker v. Jastremski*, 430 F.3d 560 (2d Cir. 2005) (analyzing the "Houston prison mailbox rule").  Petitioner certified that his Petition was delivered to the prison authorities for mailing on July 18, 2023. (Docket No. 15 at 25).  Consequently, the Court adopts Petitioner's date for this filing and all other filings discussed herein.

## I.      BACKGROUND

## A.      The Crimes, Trial and Sentence

Petitioner's conviction stems from his sexual relationship with a minor that began in July 2013 and ended in January 2014.[2]  Petitioner first met R.P.[3] in the summer of 2012 at her grandmother's hardware store in the Bronx. (Trial Tr.[4] at 305-12, 661-62).  Petitioner was a married, construction worker, and became friendly with R.P.'s grandmother after he agreed to do projects for her around the store. (*Id.* at 309-12, 348).  While working on one of those projects in the summer of 2012, Petitioner met R.P. for the first time. (*Id.* at 600-01).  He told her she was pretty and that he wanted to take her on a date, but R.P. declined, explaining to Petitioner that she was only thirteen years old. (*Id.* at 661-62).  Around the same time, Petitioner's marriage began to deteriorate, and he had to move out. (*Id.* at 310-12).  R.P.'s grandmother offered to let him move into her home temporarily since he had no place to go. (*Id.*).

Petitioner and R.P. did not meet again until July 4, 2013, when R.P. moved in with her grandmother as well. (*Id.* at 462-63, 661-62).  At that time, Petitioner was sleeping in R.P.'s grandmother's living room. (*Id.*).  One night that summer, Petitioner followed R.P. into her grandmother's kitchen, grabbed her waist and told her that he could not resist her. (*Id.* at 466-67).  Frightened, R.P. reiterated that she was underage and left the room. (*Id.*).  The next morning, Petitioner went to R.P.'s room to apologize for the night before and asked her not to

---

[2] The Court construes the evidence presented at trial in the light most favorable to the State. *See, e.g.*, *Murden v. Artuz*, 497 F.3d 178, 184 (2d Cir. 2007).

[3] "In light of New York Civil Rights Law § 50-b, which provides that the identities of the victims of sex offenses be kept confidential by the State," this Report and Recommendation refers to the victim as "R.P." *See Lucidore v. N.Y.S. Div. of Parole*, 209 F.3d 107, 109 n.4 (2d Cir. 2000).

[4] "Trial Tr." refers to the transcript of Petitioner's trial, held from November 2 through November 14, 2019. (Docket Nos. 31-1; 31-2; 31-3).

tell anyone about his actions. (*Id.* at 467-68).  R.P. told him she would keep it to herself because she "felt bad" for him. (*Id.*).

Around the same time, Petitioner surreptitiously got R.P.'s cell phone number by using it to call himself when she was not paying attention. (*Id.* at 468-71).  Thereafter, Petitioner frequently texted R.P., complimenting her physical appearance and telling her that he loved her. (*Id.*).  He often bought her chocolate, flowers, stuffed animals and jewelry. (*Id.* at 471-73).  Eventually, on July 18, 2013, R.P. relented and told Petitioner that she was developing feelings for him. (*Id.*).  Their sexual relationship began the next day. (*Id.* at 473-76).  R.P. found Petitioner in the living room and sat on his mattress on the floor. (*Id.*).  He asked her to perform oral sex, and, when she told him she did not know how, Petitioner instructed her. (*Id.* at 475).  R.P. eventually agreed and performed oral sex on Petitioner. (*Id.* at 473-76).

The relationship continued.  Petitioner secretly drove R.P. to school most mornings. (*Id.* at 443, 478-80).  To conceal their relationship, he would pick her up at a train station on her route and drive her the rest of the way to school. (*Id.*).  When school was over, he picked her and her friend, Jessica, up in the afternoon. (*Id.* at 443).  The three would spend time in the car together on quiet streets, and Petitioner and R.P. would often become intimate. (*Id.* at 443-47, 480-83).  At times, Jessica became uncomfortable and would sit outside of the car while the two kissed and engaged in oral sex. (*Id.*).  Petitioner was careful to always cover his tracks, and after spending time with R.P., he would drive her back to the same train stop where she met him in the morning, so she could ride the train the rest of the way home. (*Id.* at 480).

Petitioner lived in R.P.'s grandmother's house until October 2013, when, intoxicated at a barbecue, he professed his love for R.P. (*Id.* at 481-82).  Upon hearing this confession, R.P.'s grandmother kicked him out of the house. (*Id.*).  However, Petitioner continued to pursue R.P.

(*Id.* at 482).  They communicated via text and video call and Petitioner would visit her at her grandmother's house when her grandmother was not there or was asleep. (*Id.*).  On December 18, 2013, Petitioner and R.P. had sexual intercourse for the first time. (*Id.* at 483, 486-87).  The next day, December 19, 2013, the two had sex a second time, (*id.* at 487-88), and they had sex for a third time on January 15, 2014, (*id.* at 489-91).  Each time they had sex, Petitioner removed his gum and stuck it behind R.P.'s headboard. (*Id.* at 532-33).  R.P. confided in Jessica about her sexual relationship with Petitioner. (*Id.* at 488).

The relationship continued apace until R.P.'s mother, Vanessa, came to visit her after discovering a photo of Petitioner kissing R.P. on his social media account. (*Id.* at 358-59).  When she arrived, Vanessa found R.P. facetiming with Petitioner while alone in her bedroom. (*Id.* at 492-95).  Vanessa took R.P.'s iPad away and disconnected the call. (*Id.*).  Petitioner repeatedly tried to call back. (*Id.*).  Vanessa eventually picked up and told him she was going to call the police if he did not stop. (*Id.*).  Vanessa confiscated R.P.'s iPhone as well and drove her to the police station. (*Id.*).  When they arrived at the station, R.P. and Vanessa met with Detective James Barrenger of the New York City Police Department. (*Id.* at 362-65, 495-97).  He asked Vanessa to step outside so that he could interview R.P. privately. (*Id.*).  R.P. refused to speak with him, so Vanessa threatened to take her to the doctor to see if R.P. had lost her virginity if she refused to tell the police about her relationship with Petitioner. (*Id.*).  R.P. initially refused, but later relented and told Detective Barrenger about her sexual relationship with Petitioner. (*Id.* at 495).  Detective Barrenger then had R.P. call Petitioner in a series of taped phone calls. (*Id.* at 497-502).  In one of the calls, R.P. told Petitioner that she thought the condom broke when they had sex. (*Id.* at 363-64, 497-502).  Petitioner told her that it would be alright, they would keep the baby and that she would raise the baby while he was in jail, since Petitioner would eventually

be released. (*Id.* at 498-501).   However, R.P. still wanted to protect Petitioner, and later signed a false statement to the police that she and Petitioner had sex in a hotel to mislead them. (*Id.* at 503-04).  R.P. also warned Petitioner that the police were looking for him and told him that he should leave the country as soon as possible. (*Id.* at 505).  Petitioner left for Guyana, where he was born, the next day. (*Id.*).

Petitioner and R.P continued to communicate until late 2015, using burner phones to send sexually explicit messages to each other. (*Id.* at 506-12).  Each time Vanessa would find one of R.P.'s phones, she would take it away. (*Id.* at 376-84, 506-12, 550-60, 621-22).  Eventually, Vanessa decided to move R.P. to Massachusetts so that she could keep an eye on her. (*Id.*).  After moving, Vanessa found R.P. with another phone that R.P. had a friend purchase for her. (*Id.* at 620-22).  Vanessa confiscated that phone as well. (*Id.*).  However, while in Guyana, Petitioner continued to send R.P. gifts and money via Western Union. (*Id.* at 317-18, 367-70, 380, 517-19, 585-89).  On one occasion, he sent flowers for her birthday to her grandmother's address, which her grandmother hid from R.P. in the basement. (*Id.* at 317-18, 367-70).  After admitting to R.P. that he had relations with another woman, Petitioner got two tattoos of R.P.'s name: one on his forearm and one on his chest to show his commitment to her. (*Id.* at 590-93).

Petitioner returned to the United States in March of 2016, and upon his arrival he immediately went to visit R.P. in Massachusetts. (*Id.* at 622-26, 669-70, 675).  R.P. concealed this continued contact with Petitioner from her family. (*Id.*).  On July 6, 2016, Petitioner drove by the hardware store, where R.P. sat out front with her younger cousin. (*Id.* at 513-14).  He did not speak to her, only to her cousin. (*Id.*).  When he left, R.P. revealed to her grandmother and mother that Petitioner was back in town and had been visiting. (*Id.* at 670, 674).  Vanessa took R.P. to the police station, where she turned over her current phone and gave police the receipt

from the birthday flowers and handwritten Christmas card Petitioner had sent her. (*Id.* at 751). After recovering this evidence, as well as the gum Petitioner left on R.P.'s headboard, which matched his DNA, the police arrested Petitioner on July 8, 2016. (*Id.* at 531, 701).

Petitioner was indicted on February 7, 2017, in the County Court of Westchester County, New York for: (1) three counts of Rape in the Second Degree; (2) one count of Criminal Sexual Act in the Second Degree; and (3) two counts of Sexual Abuse in the Third Degree. (Docket No. 30-2). On February 8, 2017, pursuant to New York Criminal Procedure Law ("N.Y. C.P.L") § 180.80, the State filed a "Certification of Indictment" to prevent Petitioner from being released from custody while awaiting re-indictment and the presentation of additional evidence to the grand jury. (Docket No. 29 at 8). Petitioner was then re-indicted on February 14, 2017. (*Id.*). Petitioner pleaded not guilty, but the jury convicted him on November 14, 2017, of three counts of Rape in the Second Degree, while acquitting him on the remaining counts of the indictment. (Trial Tr. at 971-74). On January 9, 2018,[5] Petitioner was sentenced to three consecutive terms of seven years of imprisonment and ten years of supervised release. (Sentencing Tr.[6] at 15-17).

**B.    Direct Appeal**

Petitioner filed a direct appeal through counsel on August 8, 2019, arguing that: (1) the evidence was legally insufficient, (Docket No. 30-9 at 48-51[7]); (2) the verdict was against the weight of the evidence, (*id.*); (3) the court improperly admitted three controlled phone calls and denied an adverse inference instruction as to the partial destruction of one of the calls, (*id.* at 28-

---

[5] The transcript from Petitioner's sentencing hearing contains a typographical error, indicating that it took place on January 9, 2017, which was before Petitioner was indicted, rather than January 9, 2018, when the hearing occurred. (Docket No. 31-4).

[6] "Sentencing Tr." refers to the transcript of Petitioner's sentencing hearing, held on January 9, 2018. (Docket No. 31-4).

[7] Unless otherwise noted, all page numbers refer to the numbers generated by the Court's electronic case filing system ("ECF").

35, 45-47); (4) counsel provided ineffective assistance for failing to preserve a claim related to the controlled calls, (*id.* at 28-35); (5) the court improperly denied Petitioner's motion for a mistrial, (*id.* at 40-44); (6) the court improperly declined to admit evidence offered by the defense, (*id.* at 52-54); and (7) the consecutive sentences imposed constitutes cruel and unusual punishment, (*id.* at 36-39).

By Decision and Order, dated April 7, 2021, the Supreme Court of the State of New York, Appellate Division, Second Judicial Department (the "Second Department") affirmed Petitioner's conviction and sentence. *See People v. Azeez*, 146 N.Y.S.3d 284 (2d Dep't 2021). Petitioner then sought leave to appeal the Second Department's decision to the New York Court of Appeals (the "Court of Appeals"), which was summarily denied on August 26, 2021. *See People v. Azeez*, 152 N.Y.S.3d 395 (N.Y. 2021).

**C.      State Court Petitions**

While his direct appeal was pending, Petitioner filed several petitions for a writ of habeas corpus in state court.  First, Petitioner filed a petition for a writ of habeas corpus in the New York State Supreme Court, Wyoming County (the "Wyoming County Court") on April 25, 2020. (Docket No. 30-16).  On May 15, 2020, the Wyoming County Court denied the petition. (Docket No. 30-17).  Petitioner appealed this decision to the Supreme Court of the State of New York, Appellate Division, Fourth Judicial Department (the "Fourth Department"), which affirmed the Wyoming County Court's decision on April 30, 2021. (Docket No. 30-20).  Petitioner then sought leave to appeal the Fourth Department's decision, and the Court of Appeals denied that application on November 18, 2021. (Docket No. 30-23).  Second, Petitioner also filed a separate petition for a writ of habeas corpus directly to the Fourth Department, which was denied on September 25, 2020. (Docket No. 30-18).

Finally, on August 2, 2022, Petitioner moved by order to show cause for a writ of habeas corpus in the Supreme Court of the State of New York, Appellate Division, Third Judicial Department ("Third Department"). (Docket No. 30-24). The Third Department denied the motion on September 29, 2022. (Docket No. 30-25). The Court of Appeals denied Petitioner's application for leave to appeal that decision on February 9, 2023. (Docket No. 30-27).

### D.    The Instant Petition

On June 23, 2022, Petitioner initiated this action by submitting a letter to the Clerk of Court requesting the form necessary to file a federal habeas petition and for appointment of counsel. (Docket No. 1). Petitioner sent a second letter on August 9, 2022, requesting that the Court send him "the necessary forms and information which I need to file my Petition for Writ of habeas corpus" as well as "the due date by which I have to file" the petition. (Docket No. 4 at 1). The letter also asked the Court to hold "my documents which you intend to file as my Petition for a writ of habeas corpus until the State Court make it [sic] judgment on my State Petition for writ of habeas corpus which is due on or before August 31, 2022." (*Id.* at 2). On September 19, 2022, Chief Judge Laura Taylor Swain held that Petitioner's initial letter did not constitute a proper habeas petition and directed him to "submit an amended petition within 60 days of the date of this Order." (Docket No. 5 at 1, 3-4). Petitioner then filed another letter on September 29, 2022, requesting that the court stay his case so he could "present his unexhausted meritorious constitutional claims to the state courts, and then return to this court for review of his perfected petition." (Docket No. 7 at 1). In that letter, he acknowledged that his prior letters did not constitute a properly filed habeas petition and that he "had until November 2022, to file" one. (*Id.* at 1-2). In response, the Court dismissed the case without prejudice on October 24, 2022. (Docket No. 8).

Subsequently, on May 29, 2023, Petitioner requested that the court reopen his case and appoint counsel. (Docket No. 11).  The court granted Petitioner's request to reopen the case on June 14, 2023, but denied his request for appointment of counsel. (Docket No. 12).  In that Order, the court gave Petitioner an additional 60 days to file a completed habeas petition but directed him to "provide reasons why he did not submit his petition on time" if he believed "that [it was] untimely." (*Id.* at 3).  Petitioner finally submitted his habeas petition in the correct form on July 18, 2023. (Docket No. 15).  Construing the petition broadly, *see Williams v. Kullman*, 722 F.2d 1048, 1051 (2d Cir. 1983) (holding that pleading requirements in habeas proceedings should not be "overly technical and stringent"), Petitioner asserts twelve claims: (1) the trial court lacked jurisdiction to try his case and impose a sentence; (2) there is new evidence that has been discovered after the trial proving his innocence; (3) the indictment was fraudulently filed and, therefore, there was no valid indictment against him; (4) he was denied his right to a fair trial due to (i) bias, corruption and prejudice by the trial judge and the State, and (ii) jury misconduct; (5) he was denied the right to a speedy trial; (6) his confession was coerced; (7) he is factually innocent; (8) he was falsely arrested; (9) the evidence presented against him was fabricated; (10) he is being unlawfully imprisoned; (11) his imprisonment constitutes cruel and unusual punishment; and (12) he received ineffective assistance of counsel. (Docket No. 15 at 4).[8]

## II.   DISCUSSION

Respondent argues, *inter alia*, that the Petition should be dismissed because it is time-barred. (Docket No. 22 at 30-32).  Upon a review of the record, the Court agrees that the Petition

---

[8] Petitioner purports to allege numerous other constitutional claims, but they are duplicative and/or included in those listed above.

is untimely, and Petitioner fails to provide compelling reasons to toll the one-year statute of limitations. Accordingly, the Court respectfully recommends that the Petition be dismissed.

## A.    Limitations Period

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). "Before a federal district court may review the merits of a state criminal judgment in a habeas corpus action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254." *Visich v. Walsh*, No. 10 Civ. 4160 (ER)(PED), 2013 WL 3388953, at *9 (S.D.N.Y. July 3, 2013).[9] The statute allows for four different potential starting points to determine the limitations period, and states that the latest of these shall apply:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d).

---

[9] If Petitioner does not have access to cases cited herein that are available only by electronic database, then he may request copies from Respondent's counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of such unpublished cases and other authorities as are cited in a decision of the Court and were not previously cited by any party.").

Petitioner does not argue that the State prevented him from filing his Petition.  Nor does he explicitly seek to toll the statute of limitations based on a newly recognized constitutional right.  His sole argument is that the State "forged" the indictment against him, and he did not learn that until after his conviction. (Docket No. 1 at 7).  However, Petitioner raised the allegedly defective indictment during his trial, (Trial Tr. at 876), and appears to acknowledge in the Petition that he also discussed the issue with counsel as early as 2017, so this argument is meritless. (*Id.* at 6-10).  Moreover, defects in a state's grand jury procedures are not cognizable on federal habeas review, and even if the indictment was deficient, this error was cured by Petitioner's conviction at trial. *See Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989) ("[i]f federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack brought in a federal court"); *Carrino v. Lee*, No. 21 Civ. 5909 (VB)(PED), 2023 WL 4304799, at *18 (S.D.N.Y. Jan. 31, 2023) ("any error that may have occurred is rendered harmless by a defendant's subsequent conviction in a criminal trial"), *report and recommendation adopted sub nom. Carrino v. Eckert*, 2023 WL 4296182 (S.D.N.Y. June 30, 2023).

Therefore, the appropriate triggering date here is "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).  "[A] petitioner's conviction becomes final for AEDPA purposes when his time to seek direct review in the United States Supreme Court by writ of certiorari expires." *Williams v. Artuz*, 237 F.3d 147, 150 (2d Cir. 2001) (internal quotations omitted) (cleaned up).  A party has ninety days in which to file a petition for a writ of certiorari requesting review of a state court decision. Sup. Ct. R. 13(1); *Bowles v. Russell*, 551 U.S. 205,

212 (2007); *Saunders v. Senkowski*, 587 F.3d 543, 547-48 (2d Cir. 2009); *Valverde v. Stinson*, 224 F.3d 129, 133 (2d Cir. 2000).

Here, the Court of Appeals denied Petitioner's application for leave to appeal the Second Department's denial of his direct appeal on August 26, 2021. *See People v. Azeez*, 152 N.Y.S.3d 395 (N.Y. 2021). He then had ninety days, until November 24, 2021, to seek review of this order with the United States Supreme Court. Petitioner did not file a petition for a writ of certiorari, so his conviction became final on November 24, 2021. Thus, absent tolling, the AEDPA statute of limitations expired on November 28, 2022,[10] one year later. As a result, Petitioner's July 18, 2023 Petition is untimely absent tolling. Petitioner's argument that his June 23, 2022, and August 12, 2022, letters to the court seeking information in advance of filing a habeas petition render his July 18, 2023 Petition timely, is unavailing. As noted by Chief Judge Swain in her September 19, 2022 Order, these letters were facially deficient and not proper habeas petitions because Petitioner did not "state his grounds for relief," as required under 28 U.S.C. § 2254. (Docket No. 5 at 2). While Chief Judge Swain granted Petitioner an additional 60 days to file a proper petition, he did not do so. (*Id.*). Instead, he filed a letter on September 29, 2022, that acknowledged he had "until November 2022 to file his petition seeking Federal Habeas Corpus relief[,]" while noting that it was not his "intention" to open a federal case at that time as he was "simply asking the court to provide him with a blank form" to be filed in the future. (Docket No. 7 at 1-2). Consequently, Petitioner's initial filings in advance of his July 28, 2023 submission do not constitute a properly filed petition. *See Sanders v. Chappius*, No. 12 Civ. 3339 (BSJ)(JCF), 2012 WL 6756238, at *3 (S.D.N.Y. Nov. 9, 2012) ("[w]riting a letter does not constitute a

---

[10] 365 days from November 24, 2021 is actually Thursday, November 24, 2022, but this was the federal holiday of Thanksgiving, and the following day the Court was closed, so the "period continues to run until the end of the next day that is not a . . . legal holiday," which is November 28, 2022. *See* Fed. R. Civ. P. 6(a)(1)(C).

properly filed application for State post-conviction [relief] or other collateral review, and therefore d[oes] not toll the AEDPA's statute of limitations") (citation and internal quotation omitted), *report and recommendation adopted*, 2013 WL 28471 (S.D.N.Y. Jan. 2, 2013).

Accordingly, I conclude and respectfully recommend finding that absent tolling, the time for Petitioner to file his Petition expired on November 28, 2022, and his July 18, 2023 Petition is untimely.

## B.    Statutory Tolling

The AEDPA contains a tolling provision providing that "[t]he time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). "Section 2244(d)(2)'s tolling provision excludes time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000).

Petitioner collaterally attacked his conviction in state court three times. First, he filed a petition for a writ of habeas corpus in the Wyoming County Court, which was denied on April 25, 2020. (Docket Nos. 30-16; 30-17). Denial of this petition became final on November 18, 2021, when the Court of Appeals denied his application for leave to appeal the Fourth Department's order affirming the Wyoming County Court's dismissal of the petition. (Docket No. 30-23). Second, Petitioner filed another petition for a writ of habeas corpus directly to the Fourth Department, which was denied on September 25, 2020. (Docket No. 30-18). Since Petitioner did not apply for leave to appeal this decision to the Court of Appeals, the Fourth Department's decision became final 30 days later, on October 26, 2020. *See* New York Civil

Practice Law and Rules ("N.Y. C.P.L.R.") §§ 5513(a), 7002. Finally, Petitioner filed a third petition for state habeas relief on August 2, 2022. (Docket No. 30-24). This petition was denied by the Third Department on September 29, 2022, (Docket No. 30-25), and the Court of Appeals denied Petitioner's application for leave to appeal on February 9, 2023, (Docket No. 30-27).

None of these petitions render the instant Petition timely. Petitioner's first two state habeas petitions became final before his direct appeal concluded on November 28, 2022. Therefore, neither toll the statute of limitations. *See* 28 U.S.C. § 2244(d)(1)(A)(2); *accord Johns v. Att'y Gen. of the State of New Jersey*, No. 20-CV-1336 (NLH), 2021 WL 1851899, at *3 (D.N.J. May 10, 2021) (holding that a state habeas petition did not toll the AEDPA statute of limitations where a petitioner still had time to file a writ of certiorari "because AEDPA's year does not start until a conviction is final . . . [so] there was nothing for the [state habeas] petition to toll because the one year had not yet started."); *Milton v. Lee*, No. 19-CV-672 (BMC), 2019 WL 1958262, at *1 (E.D.N.Y. May 2, 2019) ("[O]ne cannot toll a time period that has not yet begun to run."); *Thomas v. Salazar*, 559 F. Supp. 2d 1063, 1067 (C.D. Cal. 2008) ("[P]etitioner filed a habeas corpus petition in [state court], and it was denied . . . before the judgment of his conviction became final; thus, this habeas petition did not toll the statute of limitations, which had not yet begun to run."). While the State is correct that there is a split in this district over what constitutes a properly filed application in state court for purposes of tolling the statute of limitations under the AEDPA, c*ompare Forman v. Artuz*, 211 F. Supp. 2d 415, 420-21 (S.D.N.Y. 2000) *with Smalls v. Smith*, No. 05-CV-5182 (CS), 2009 WL 2902516, at **6-7 (S.D.N.Y. Sept. 10, 2009), the Court need not resolve that split here.

Petitioner's first two state habeas petitions were decided *before* his direct appeal concluded, which is the triggering date for the statute of limitations to commence under the

AEDPA. *See* 28 U.S.C. § 2244(d).  As a result, he is not entitled to statutory tolling regardless of whether his first two petitions are considered properly filed for tolling purposes.  As for his third state habeas petition, even assuming, *arguendo*, that it was "the appropriate vehicle for asserting the claims raised," *Smalls*, 2009 WL 2902516, at \*6, and thus tolled the statute of limitations for 191 days (from August 2, 2022 to February 9, 2023), Petitioner still did not meet his new deadline of June 7, 2023, to file a federal habeas petition.

Accordingly, I conclude and respectfully recommend finding that even if Petitioner's deadline to file a federal habeas petition was statutorily tolled for 191 days, until June 7, 2023, Petitioner still failed to meet this deadline and, thus, his Petition is untimely.

## C.    Equitable Tolling

In *Holland v. Florida*, the Supreme Court held that the AEDPA limitations period "is subject to equitable tolling in appropriate cases." 560 U.S. 631, 645.  Equitable tolling permits a court to entertain an otherwise untimely habeas petition if the petitioner establishes: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* at 649 (internal quotation marks omitted).  "As a general matter, [the Second Circuit] set[s] a high bar to deem circumstances sufficiently 'extraordinary' to warrant equitable tolling." *Dillon v. Conway*, 642 F.3d 358, 363 (2d Cir. 2011).  "The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011).

Courts have found "extraordinary circumstances" in only a small number of situations. *See, e.g.*, *Dillon*, 642 F.3d at 363-64 (attorney "affirmatively and knowingly [*misled*] [petitioner] by promising him that he would file the petition before the [last day to file]") (emphasis in

original); *Diaz v. Kelly*, 515 F.3d 149, 154-55 (2d Cir. 2008) (state appellate court failed to inform prisoner that leave to appeal was denied); *Baldayaque v. United States*, 338 F.3d 145, 150-153 (2d Cir. 2003) (finding extraordinary circumstance where attorney willfully ignored his client's explicit instruction to file his habeas petition); *Valverde*, 224 F.3d at 133 (remanding petition to the district court where petitioner's sworn statements established that he was unable to file a timely petition because his legal papers were confiscated); *see also Holland*, 560 U.S. at 650-52 (suggesting that "extraordinary circumstances" may be present when the attorney, *inter alia*, failed to file a timely habeas petition despite petitioner's many letters instructing him to do so; did not inform petitioner that the state's highest court had decided his case; and ignored petitioner's letters for a period of years).

Here, Petitioner argues that he is entitled to equitable tolling for two reasons: (1) he "don't [sic] have any knowledge of the laws and process of the New York State and the United States Courts," has "difficulty reading and understand[ing] what he read," "can't speak and write proper English," and needs time "to educate himself on the law and process," (Docket No. 50 at 2); and (2) "was tricked by all three level[s] of NYS State Court, to bar his constitutional and jurisdictional claims and to make the AEDPA time limitation to run out," (*id.* at 3).  Both arguments are unavailing.  First, "[a] petitioner's *pro se* status and ignorance of the law do[es] not warrant equitable tolling." *Rodney v. Breslin*, No. 07-CV-4519 (SLT)(RML), 2008 WL 2331455, at *4 (E.D.N.Y. June 3, 2008) (citing *Smith*, 208 F.3d at 18); *see also Mitchell v. Miller*, 21-CV 04744 (GHW)(JLC), 2022 WL 17544534, at *4 (S.D.N.Y. 2022) ("Courts in this Circuit have repeatedly observed that an unintentional or mistakenly late filing does not rise to the level of an extraordinary circumstance meriting equitable tolling . . . regardless of whether a petitioner was *pro se*.") (citations and internal quotations omitted) (collecting cases).

- 16 -

Second, Petitioner's contention that he does not understand the filing process is belied by the record. He filed three separate state habeas petitions seeking to overturn his conviction, two of which were submitted while he was directly appealing his conviction. (*See* Docket Nos. 30-16; 30-17; 30-24). In addition, he has filed numerous letters to this Court seeking, among other things, form documents, updates as to the status of the case, appointment of counsel, discovery, and a stay of the proceedings. (*See, e.g.*, Docket Nos. 1, 4, 6, 7, 10, 11, 14, 16, 17, 20, 24). Thus, his claim that he could not file the Petition within the applicable statute of limitations period because he did not understand the process for doing so, is contradicted by his own actions. Petitioner's only other argument in favor of equitable tolling is that he did not discover that the indictment against him was defective until after the statute of limitations expired. (Docket No. 50 at 5-6). However, as explained previously, this argument is unsupported by the record and would not be cognizable on federal habeas review even if the Petition was timely. *See supra* Section II.A.

Accordingly, the Court respectfully recommends finding that Petitioner has not shown extraordinary circumstances warranting equitable tolling of the statute of limitations.

**D.      Actual Innocence**

To make a colorable claim of actual innocence, a petitioner must establish that it is "more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 114 (2d Cir. 2000) (citations and internal quotations omitted). The petitioner must also present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *House v. Bell*, 547 U.S. 518, 537 (2006); *see also Doe v. Menefee*, 391 F.3d 147, 161-62 (2d Cir. 2013).

Here, besides complaining about the investigation that led to his arrest, and the allegedly defective indictment filed against him, Petitioner relies entirely on conclusory proclamations of innocence. (*See, e.g.*, Docket No. 50 at 9) ("Petitioner did not allege a defect in the grand jury proceeding.  Petitioner claims he has been kidnapped and unlawfully detained against his liberty by force and by fraud.").  He submits no new exculpatory evidence and much of what he complains of was cured by his conviction at trial. *See supra* Section II.A.  Moreover, the State presented substantial evidence of Petitioner's guilt, including: (1) testimony from the victim that she had sex with Petitioner while only 14 years old, (Trial Tr. at 474-80); (2) recorded phone calls between Petitioner and the victim where he admits to having a sexual relationship with her, (*id.* at 686-94); (3) his DNA from gum police collected in the victim's bedroom, (*id.* at 767-78); (4) eyewitness testimony from the victim's friend that she saw them being "very intimate with each other," and having "oral sex," even though R.P. was only 14 years old at the time, (*id.* at 444-45); and (5) explicit text messages exchanged between Petitioner and the victim, (*id.* at 508-09).  Therefore, the actual innocence exception does not apply. *See, e.g.*, *Knowles v. United States*, No. 11-CR-630 (KMK), 2022 WL 999078, at *17 (S.D.N.Y. Mar. 30, 2022) (holding that the actual innocence exception "cannot salvage" a petitioner's arguments where the "evidence of [his] guilt at trial was overwhelming") (collecting cases) (quoting *United States v. Corley*, No. 13-CR-48 (AJN), 2020 WL 4676650, at *10 (S.D.N.Y. Aug. 11, 2020)).

Accordingly, the Court concludes and respectfully recommends finding that the actual innocence exception does not apply here.

## III.    CONCLUSION

For the reasons set forth above, I conclude and respectfully recommend dismissing the instant Petition as untimely.  Further, because reasonable jurists would not find it debatable that

Petitioner has failed to demonstrate by a substantial showing that he was denied a constitutional right, I recommend that no certificate of appealability be issued. *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000).

The Clerk of Court is requested to mail a copy of this Report and Recommendation to the *pro se* Petitioner.

## IV.    NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts, the parties shall have fourteen (14) days from the receipt of this Report and Recommendation to serve and file written objections.  If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d).  Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Kenneth M. Karas at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Requests for extensions of time to file objections must be made to the Honorable Kenneth M. Karas and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be

- 20 -

rendered. *See* 28 U.S.C. § 636(b)(1); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:  August 7, 2024
        White Plains, New York

                                 **RESPECTFULLY SUBMITTED,**

                                   JUDITH C. McCARTHY
                                   United States Magistrate Judge